## Staunton

JOSIE K. COUCH, ET ALS. V. J. W. COX, ADMINISTRATOR, ET ALS.

September 19, 1935.

Present, Campbell, C. J., and Holt, Gregory, Browning, Chinn and Eggleston, JJ.

The opinion states the case.

*Warren & Cantwell,* for the appellants.

*Hagan Bond* and *S. H. Bond,* for the appellees.

CAMPBELL, C. J., delivered the opinion of the court.

This controversy had its inception in a notice of motion filed by the appellants, Josie K. Couch, et als, against the administrator of John M. Catron, seeking damages for an alleged breach of contract upon the part of Catron, to execute a will in favor of appellant, Josie K. Couch, and her three children, John M. Couch, Elizabeth Couch and George J. Couch. Upon a plea of the general issue and two special pleas, issue was joined and a jury empanelled to try the case. At the conclusion of the evidence, counsel for the plaintiffs moved the court to transfer the case to the chancery side of the court, which motion, over the objection of the defendant, was granted, and pursuant to the provisions of section 6084 of the Code, plaintiffs were permitted to file their bill of complaint praying for the specific execution of the alleged contract.

The heirs at law of John M. Catron were made parties defendant to the bill. They filed an answer denying that such a contract as claimed ever existed, and relied upon the defense that if such a contract ever did exist, it was obnoxious to the statute of frauds.

The bill of complaint and proof sets forth these facts and circumstances: Josie Couch was the daughter of W. F.

and Mrs. Elizabeth Catron and a sister of John M. Catron. Upon the death of her father she continued to live with her mother and brother. The brother, by purchase, became the owner of a four-fifths undivided interest in the ancestral tract of land upon which he had resided all of his life. The other one-fifth was owned by Josie Catron.

On January 21, 1914, Josie was united in marriage to Noah C. Couch. It is alleged and not controverted that the condition imposed by the mother upon these young people, before she would give her consent to the marriage, was that they were to continue to live with her and John, who was a bachelor. That condition was fully complied with until the death of Mrs. Catron in November, 1923. Mrs. Catron died on Friday and on the Monday following it is alleged that Mrs. Couch, in the presence of her husband, informed her brother that they had fulfilled the mother's wish and that they felt it their duty to set up a home for themselves and to accumulate something for themselves and their three children. That this bachelor brother was extremely fond of his sister and her children is fully shown by the proof that they dwelt together in peace and harmony. It is shown that the eldest son, who was named for John Catron, had slept with his uncle since infancy and was the especial object of his affection and bounty. When appraised of his sister's intention, John remonstrated with her, stating that he would be ruined if she left, and as an inducement for her to remain, he stated that if she would remain and continue to make a home for and care for him as she had done in the past, that he would devise her and her children all of his property. In conclusion, the bill alleges that:

"In accordance with that contract the complainants aforesaid continued to live in the home of the said John M. Catron, and kept and maintained his home for him and assisted him in the operation of his farm until his death on the 13th day of January, 1933. Complainants would further show that they all lived together in peace and harmony, and that they performed their part of the agree-

ment faithfully and well; that there was never any discord or disagreement between the complainants and John M. Catron, nor any question as to his intention to carry out his part of the agreement."

The trial court was of opinion that the bill should be dismissed, and decreed accordingly. From that decree this appeal was allowed.

In our opinion, a careful analysis of the evidence does not show such a marked conflict as would warrant this court in deciding the case upon a conflict of evidence. The question, then, for determination is, does the evidence sustain the allegation of the bill that the contract as contended for was entered into between the parties, and if so, is the alleged contract obnoxious to the statute of frauds?

In corroboration of the positive statement of Noah and Josie Couch that the contract as alleged in the bill was entered into and performed upon their part, eight disinterested witnesses testified that at various times during the period of years the Couches lived with Catron they had heard John M. Catron state that he did not "aim to have the place divided;" that "he was going to make a will and that he aimed to make it in favor of his sister and children;" that "he never expected to marry and that he wanted Josie and the children to have what is here;" that "he had an understanding with them (Josie, etc.) and that he was going to give them what he had."

A short time prior to his death Catron went to see W. H. Nickels, an attorney at law residing in Gate City, the county seat, and asked him how his estate would be distributed in case he should die without a will. Mr. Nickels testified that he informed him that it would descend to his next of kin, his brother, nieces and nephews and his sister Josie. Catron then remarked, "Well, I will be up in a few days and get you to make my will."

A short time thereafter Catron again visited Mr. Nickels. He said, "I came to make my will, but I don't know if I have time, they are waiting for me." He again enquired as to the disposition of his property, and when again in-

formed as to the result of dying intestate, he remarked, "I 'lowed that us living together, it would go to Josie and her family or children." Catron left the office with the remark, "Maybe I'll be up tomorrow." Catron died suddenly a short time thereafter.

■ Since the enunciation of the rule in *Wright* v. *Pucket,* 22 Gratt. (63 Va.) 370, in regard to the specific performance of a parol contract to make a will, this court has adhered to. the doctrine that it will avoid the statute of frauds and enforce a parol contract for the sale of land when the following conditions are complied with: "1st. The parol agreement relied on must be certain and definite in its terms. 2nd. The acts proved in part performance must refer to, result from or be made in pursuance of the agreement proved. 3rd. The agreement must have been so far executed that refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation."

■ A case analogous to the case at bar is *Cannon* v. *Cannon,* 158 Va. 12, 18, 163 S. E. 405, 407. In sustaining the decree of the lower court enforcing a parol agreement to devise lands, Mr. Justice Gregory said:

"Acts of part performance in order to take a case out of the operation of the statute of frauds must be referable solely to the contract which is to be enforced. They must be in consequence of the contract and such as would not have been done but for the contract. Where, as is the case here, the parol agreement is founded on a consideration consisting of services rendered which are of a character that it is impossible to estimate the value by a pecuniary standard, and it was never intended that they should be so measured, the performance of the services will entitle the party who has performed them to a conveyance of the land."

The case at bar stands on a different footing from the ordinary case where one merely performs the usual service of supplying another with the necessities of life in consideration of a conveyance or a devise of land. Here

we have a sister who, while her brothers and sisters had left the "home place" in order to better their condition in life, had remained with her widowed mother and bachelor brother until the death of the mother and then had for a period of ten years "made a home for her brother." It is an easy matter to compensate one who merely furnishes labor to and supplies another with necessities, but it is impossible to measure the gift of affection, the solace of companionship and the tender ministration of a woman when one is sick, as this record shows Catron frequently was. On the other hand, appellees do not claim that they are entitled to share in the distribution of their relative's estate, except by operation of law. While the record does show that appellants and John M. Catron shared in common the proceeds of the farm, it also shows that appellant, Josie Couch, and her husband made improvements upon the property with the consent of Catron, and generally dealt with the property as their own.

In our opinion the appellants have fully complied with the requirements of the law applicable to a case of this nature and are entitled to an enforcement of the contract relied upon.

The decree of the lower court will be reversed and annulled and this court will enter a decree in accordance with the prayer of the bill of complaint.

*Reversed.*